AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
JUN 07 2023
AT_____ O'CLOCK
John M. Domurad, Clerk - Albany

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
(1) One Grey MOTO G Power Cellular Phone, (2) One Black ZTE Blade V9 Vita Cellular Phone, and (3) One SIM Card 4G currently located at 127 North Water Street, Ogdensburg, New York 13669 )

Case No. 8:23-MJ-325 (CFH)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see Attachment A.

located in the Northern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii) & (v)(I) | Conspiracy to commit alien smuggling and alien smuggling |

The application is based on these facts:
Please see attached affidavit.

☐ Continued on the attached sheet.
☐ Delayed notice of ___days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

U.S. Border Patrol Agent Nicholas L. Dimon
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date: June 7, 2023

City and state: Albany, NY

*Judge's signature*

Hon. Christian F. Hummel, U.S.M.J.
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>(1) One Grey MOTO G Power Cellular Phone, (2) One Black ZTE Blade V9 Vita Cellular Phone, and (3) One SIM Card 4G currently located at 127 North Water Street, Ogdensburg, New York 13669 | 325<br>Case No. 8:23-MJ-   (CFH) |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER FED. R. CRIM. P. 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Nicholas L. Dimon, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of (1) One Grey MOTO G Power Cellular Phone, (2) One Black ZTE Blade V9 Vita Cellular Phone, (3) One SIM Card 4G (together, "the Devices"), which are currently in law enforcement possession as more particularly described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Border Patrol Agent (BPA) with the United States Department of Homeland Security (DHS), Bureau of Customs and Border Protection (CBP), United States Border Patrol (USBP) and assigned to the Ogdensburg Border Patrol Station. I have been a Border Patrol Agent since September 2010. My primary duty is to assist in the prevention of illicit trafficking of people and contraband between the official ports of entry. My authority to perform this mission is articulated in the Immigration and Nationality Act, sections 235 and 287, and Title 8 U.S.C. Section 1357. These bodies of law relate to, among other things, a Border Patrol Agents authority to interrogate any alien or person believed to be an alien,

1

and to make an arrest of any alien who is entering or attempting to enter the United States in violation of the immigration laws. To enforce these laws, I have received training at the Federal Law Enforcement Training Center in Artesia, New Mexico in Law, Operations, Firearms, Driving Techniques, and Physical Techniques.

3. I have investigated numerous violations of the Immigration Nationality Act (INA) including illegal entry of aliens in violation of Title 8, United States Code, Section 1325, and the smuggling of aliens in violation of Title 8, United States Code, Section 1324. I have assisted in the writing and execution of search warrants for electronic devices and have reviewed the evidence contained within. I have analyzed data and information from electronic devices and presented that data as evidence during criminal investigations.

4. The applied-for warrant would authorize the forensic examination of the Devices, as described in Attachment A, for the purpose of identifying electronically stored data described in Attachment B. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Jose Enrique GUERRA-BANDALA ("GUERRA") and Victor Edilzar FUENTES-DIAZ ("FUENTES") have committed violations of 8 U.S.C. § 1324(a)(1)(A)(ii) & (v)(I), by conspiring to commit alien smuggling and committing alien smuggling. There is also probable cause to search the property described in Attachment A, for evidence of these crimes as described in Attachment B.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

6. As described further in Attachment A, the Devices are:

2

  i. A Grey MOTO G Power Cellular Phone bearing IMEI No. 357081731083241, seized from Jose Enrique GUERRA-BANDALA.

  ii. A Black ZTE Blade V9 Vita Cellular Phone bearing IMEI No. 867942031067197, seized from ROCIO HERNANDEZ ("HERNANDEZ")

  iii. A SIM Card bearing serial no. 382390464, seized from HERNANDEZ

7. The Devices are currently located at the Ogdensburg Border Patrol Station, 127 North Water Street, Ogdensburg, New York 13669.

## PROBABLE CAUSE

8. On June 3, 2023, at approximately 9:00 A.M., an Ogdensburg Border Patrol Agent (the "BPA") was conducting roving patrol duties in a marked United States Border Patrol vehicle. An off-duty Border Patrol supervisor contacted agents in the field and reported a suspicious vehicle in the Hopkinton, New York area. The supervisor reported the vehicle as a black Toyota RAV4 with two male occupants. The vehicle was traveling east on US Highway 11 toward a highly utilized smuggling area. US Highway 11 is a prevalent route used by migrant smugglers to transport individuals who cross the international border in the United States from Canada illegally. The Border Patrol stations to the east of Ogdensburg have recently seen a drastic increase in alien smuggling operations.

9. At approximately 10:20 A.M., the BPA was traveling east on US Highway 11 in Gouverneur, New York when a black Toyota RAV4 passed the BPA heading westbound toward the interior United States. The BPA noted the vehicle was bearing an out of state license plate. The RAV4 matched the description of the vehicle reported by the Supervisor. The BPA turned around and went westbound. Once the BPA was behind the

3

black Toyota RAV4, the BPA could see that there were three occupants in the vehicle, rather than the two originally reported by the supervisor. The extra occupant seated in the middle of the rear passenger seat. The BPA followed the vehicle west on US Highway 11 to get its the license plate number and conduct record checks. The BPA observed that the vehicle bore North Carolina license plate no. KBE4219. The BPA then performed a traffic stop on the RAV4 to conduct an immigration inspection on the occupants of the vehicle.

10. The BPA conducted a traffic stop at approximately 10:30 A.M. on US Highway 11 in Gouverneur, New York. The BPA identified themself as a United States Border Patrol agent and asked the subjects of the vehicle to state their citizenships. The driver, FUENTES, handed the BPA his North Carolina driver's license. FUENTES stated he was a Legal Permanent Resident in the United States. BPA asked FUENTES if he was in possession of his Permanent Resident Card. FUENTES stated he did not have it on him, but that he had a picture of it on his phone.

11. The BPA asked FUENTES to lower the back window to obtain visual confirmation of a female subject located in the rear passenger seat. This female subject was later identified as Rocio HERNANDEZ-HERNANDEZ ("HERNANDEZ"). The BPA asked the front passenger, later identified as GUERRA, to state his citizenship. GUERRA did not answer. The BPA asked the subject a second time in the Spanish language, and GUERRA then stated "American." The BPA asked GUERRA in both English and Spanish if he was in possession of any identification to which GUERRA stated he did not have any.

12. In response to additional questioning, GUERRA stated he was illegally present in the United States. The BPA then asked HERNANDEZ if she was also in the

United States illegally, and she said "yes." The BPA asked GUERRA again if he had any identification and he provided the BPA with his Mexican Voter Identification card.

13.     FUENTES, GUERRA, and HERNANDEZ were subsequently arrested and brought to the Ogdensburg Border Patrol Station.

14.     At the Ogdensburg Border Patrol Station, record checks were conducted on all three subjects with the following results: (1) FUENTES was issued a Legal Permanent Resident status on August 16, 2022; (2) GUERRA was previously apprehended by the Border Patrol near Laredo, Texas on April 26, 2003, and was granted a Voluntary Removal; and (3) HERNANDEZ has no immigration history in the United States. None of three has any other criminal history known at this time.

15.     HERNANDEZ was found to be in possession of Canadian immigration documents dated June 2, 2023. The documents show that she arrived in Montreal, Canada on June 2, 2023, where she applied for Refugee Status in Canada.

16.     FUENTES was issued *Miranda* warnings and agreed to speak without a lawyer present. FUENTES—who spoke to agents with the assistance of a Spanish interpreter—stated he was a citizen of Guatemala and was a Legal Permanent Resident of the United States. FUENTES stated he was friends and coworkers with GUERRA and that both live in North Carolina. FUENTES originally stated he and GUERRA were in the area looking for work. FUENTES also originally stated the rear passenger, HERNANDEZ, asked for a ride at a gas station and they did not know who she was. FUENTES gave full consent to search his cellular phone. Agents were able to identify a WhatsApp conversation between FUENTES and GUERRA previous to the event, discussing driving to New York to pick up a person for money. The agents questioned FUENTES about the WhatsApp conversation,

5

and he then admitted to traveling to New York with GUERRA to pick up a person for payment. FUENTES stated GUERRA was the one in contact with HERNANDEZ and he had no contact with her. FUENTES stated GUERRA used his phone to navigate to the pickup site and FUENTES was just the driver. FUENTES stated he and GUERRA were going to transport HERNANDEZ to North Carolina. FUENTES stated he made a mistake and understood the consequences.

17. HERNANDEZ was issued *Miranda* warnings and agreed to speak without a lawyer present. HERNANDEZ—who spoke to agents with the assistance of a Spanish interpreter—said that she is a citizen of Mexico. HERNANDEZ stated she flew into Montreal, Canada on June 2, 2023. HERNANDEZ stated she met a Hispanic male at the airport in Montreal who said that he would help her cross the United States/Canada border. HERNANDEZ said the Hispanic male, whose name she did not know, set up the smuggling event and gave her the contact information for who to meet in the United States. HERNANDEZ stated she was provided a taxi to a nearby hotel in the Montreal area for the night. HERNANDEZ stated a different Hispanic man picked her up the next day to drive her to the border. HERNANDEZ stated she was dropped off at the border where she walked through the woods and eventually to a road. HERNANDEZ stated she walked to a gas station where she was picked up by FUENTES and GUERRA. HERNANDEZ stated she contacted GUERRA via WhatsApp to coordinate the pickup site. The agents asked HERNANDEZ for consent to search her cellular phone and HERNANDEZ did not give full consent for the search of her phone. However, HERNANDEZ agreed to show agents a specific cellular phone conversation via WhatsApp with GUERRA and provided the contact information for GUERRA listed in her WhatsApp contacts.

18. Based on my training and experience in this and other cross border criminal investigations I have been involved with, including individuals entering the United States illegally, individuals crossing the border illegally will often communicate and coordinate with someone to pick them up once in the United States or to inform them that they successfully crossed the border via cellular telephone. Individuals involved in crossing the border illegally, as well as those smuggling and transporting them, often use a cellular telephone's GPS function to search for and map out potential crossing and pickup locations and to navigate to such places. An additional function of cellular telephones that can be utilized by individuals crossing illegally includes the camera, as individuals will often take photos of where they are crossing the border illegally.

19. Additionally, smugglers often communicate with each other and aliens being smuggled using cellular phones and downloaded applications, like WhatsApp, to coordinate smuggling events. Smartphones, such as the Devices can also be used to access social media. Based on my training, knowledge, and experience of alien smuggling, I know that social media platforms, such as Facebook, are often used by smugglers to find customers and for communication between smugglers and aliens illegally entering the United States.

20. The Devices have been in the lawful possession of the United States Border Patrol since June 3, 2023.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series

7

of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable

storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a

keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

22. Based on my training, experience, and research, I know that cellular phones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. The examination will be performed by representatives from the Department of Homeland Security and their designees.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27. I respectfully submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Attested to by the affiant:

_____
Nicholas L. Dimon
Border Patrol Agent
United States Border Patrol

I, the Honorable Christian F. Hummel United States Magistrate Judge, hereby acknowledge that this affidavit was attested to by the affiant by telephone on June 7, 2023, in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Christian F. Hummel
United States Magistrate Judge

## ATTACHMENT A

### Property to be Searched

The property to be searched is the following three devices (collectively, the "Devices"):

    a. A Grey MOTO G Power Cellular Phone bearing IMEI No. 357081731083241, seized from Jose Enrique GUERRA-BANDALA

    b. A Black ZTE Blade V9 Vita Cellular Phone bearing IMEI No. 867942031067197, seized from ROCIO HERNANDEZ

    c. A SIM Card bearing serial no. 382390464, seized from ROCIO HERNANDEZ

The Devices are currently located at the Ogdensburg Border Patrol Station, 127 North Water Street, Ogdensburg, New York 13669.

## ATTACHMENT B

### Particular Things to be Seized

1. All information and/or records on the Devices described in Attachment A that relate to, evidence, and/or constitute instrumentalities of, violations of 8 U.S.C. § 1324(a)(1)(A)(ii) & (v)(I) (conspiracy to commit alien smuggling and alien smuggling), involving Jose Enrique GUERRA-BANDALA, Victor Edilzar FUENTES-DIAZ, and others, including:

   a. Listings of incoming and outgoing calls with corresponding date/time of calls concerning any plan to smuggle aliens into the United States;

   b. Stored telephone and address directories concerning any plan to smuggle aliens into the United States;

   c. Direct connect and identification numbers concerning any plan to smuggle aliens into the United States;

   d. Pictures and videos concerning any plan to smuggle aliens into the United States;

   e. All audio recordings concerning any plan to smuggle aliens into the United States;

   f. All voice mail recordings concerning any plan to smuggle aliens into the United States;

   g. All location and GPS data concerning any plan to smuggle aliens into the United States;

   h. All instant messaging and related stored communications concerning any plan to smuggle aliens into the United States;

   i. All SMS messages and related stored communications concerning any plan to smuggle aliens into the United States;

  j. All records related to any payment made, discussed, or promised concerning any plan to smuggle aliens into the United States; and

  k. Any other notations or electronic storage of any kind concerning any plan to smuggle aliens into the United States.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

  a. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.